## WALLACE & CO. v. T. J. HUDSON AND ANOTHER.

On October 28th, 1870, W. and his wife, at Jefferson, Texas, mortgaged separate property of the wife, to secure an overdue indebtedness of W. to the appellants. In this transaction the appellants acted by their agent, and the consideration of the mortgage was an extension of time to W. for payment of his debt. But, on the 21st of the same month, appellants, at New Orleans, had sued out attachment and garnishment against W., and when subsequently informed of the mortgage security obtained by their agent, they refused to dismiss their attachment and garnishment, but pressed them until W., to procure their dismissal, paid them a considerable part of his indebtedness—the extension of time, granted by their agent, being still unexpired. *Held*, that Mrs. W. must be regarded as a guarantor for her husband; that the consideration of her guaranty was destroyed by the acts of appellants, and thereby they lost their recourse upon her.

APPEAL from Marion. Tried below before the Hon. J. D. McAdoo.

In the opinion of the court and the arguments of counsel will be found a full statement of the facts of this interesting case.

*Mason & Campbell*, for the appellants.   " A payment made
" by the principal binds  the surety, for the  latter cannot con-
" trol the principal in the application of his funds." (Burge on
Surety, page 123.)   " Action pending, defendant submits to
" pay, though not legally liable, and .having the means of prov-
" ing his defense at the trial, he has no remedy."    (Ib., 247.)

Our position is that the payment made by Williams on the
dismissal of the suit in New Orleans was a voluntary payment
which Williams was in no manner bound to make ; that he could
have successfully resisted the payment ; that he had all the
means at hand of proving his defense at the trial, but chose to
pay rather than make his defense.    Wallace & Co. had no legal
right certainly to enforce the payment ; but it is equally cer-
tain that if offered to them, when demanded, however illegally,
they were not bound to reject it.    There is no pretense that
there was any duress in the case.    The suit in New Orleans
had been commenced before the note and mortgage were given,
and if in the compromise and settlement of that suit, Williams,
the principal debtor, chose to make a payment, and directed the
payment to be credited on the note, he cannot complain, and
certainly Mrs. Williams, his guarantor or surety, has less
right to complain.    Her liability to the extent of the payment
is diminished ; her rights under the  original contract remain
precisely the same, unchanged and unaltered, and her remedies
not in the least degree lessened.    Her liability under the guar-
anty of her mortgage did not arise till the maturity of the note,
to wit, January 1, 1871 ; and it is laid down as a general prin-
ciple that even if " agreements are made  between the creditor
" and the principal, and the remedies of the surety are not di-
" minished or  affected, and still less if they are  accelerated, as
" the surety can sustain no prejudice, he remains still liable  as
" surety."    (Burge on  Surety, 208 ; Hulme *v*. Cole, 2 Sim.,
12.)

" So, if a creditor accept from the principal a *cognovit* in an
" action he had brought against him (a confession of judgment)
" with a  stay of execution, until a  day earlier than that on

"which judgment could have been obtained in the regular "course; or for paying the debt by installments, etc., the "surety will not be discharged." (Ib.; see 18 Johns., 28; 16 Ib., 41.)

The Supreme Court of Connecticut in Terrill *v.* Smith, 8 Conn., 429, say: "The terms of the guaranty are that the "note shall be paid. Nothing short of an actual payment, or "some act or neglect of the creditor, will discharge the liability "(of the surety). There is neither principle nor honesty in "the defense, and to suffer it to prevail (the court say) would "be a reproach to the law." In the case at bar, there is no pretense of payment of the whole debt, and certainly no ground for the defendant to say that she was prejudiced. On the contrary, all her rights remain the same as under her original contract, whilst her remedies, instead of being diminished, are "accelerated" by reason of the payment and the lessening of the debt secured by her mortgage.

It is a general rule that if, after the guaranty or suretyship, there is any change in the terms or conditions of the contract whereby a new and different contract is made, without the knowledge or consent of the surety, and by which his interests are prejudiced, the surety will be discharged. (32 N. H., 574.)

If the remedies of the surety are not affected by such subsequent dealings or active interference, the reason of the law does not exist, and she is not discharged. (11 Wend., 323.) In the language of the court, in that case we are to look to the law for those remedies, and according to the practice of the courts. At the maturity of the note Mrs. Williams as surety had the right to pay the amount and seek her remedy against Williams, the principal debtor. This remedy was not affected by the appellants; on the contrary, the remedy was in fact accelerated by the payment and consequent diminution of the debt.

The Supreme Court of Ohio in a very recent case have said that "the discharge of the surety, in cases of interference by

"the creditor, is based on some recognized and well-defined "principle, and in general results from a positive act of the "creditor, which operates to the prejudice of the surety" (21 Ohio R., 93, the case of Dye v. Dye); showing that the rule is not an arbitrary one, but is based upon common sense and sound reason.

In the case at bar, what has the creditor done? Were his acts prejudicial to the rights of the surety—were her remedies abridged—did she sustain any injury thereby? Or, as the case is put by Bronson, Judge, in 7 Hill (N. Y.), 250, the question for the surety is, are my remedies unchanged at the maturity of my obligation, and may I pay the creditor at maturity and proceed against the principal? (See Story's Eq., Section 325.)

In 10 Paige, 11, the Chancellor says : "Any valid and bind- "ing agreement between creditor and principal debtor, or other "active interference of the creditor, whereby surety may be "injured, or subjected to increased risk, will discharge surety." No pretense in this case that Mrs. Williams was "injured" in any possible way by the payment on the note, or subjected in any manner to increased risks.

"Nothing is required of the creditor except that he should "not increase the hazard of the surety, or do anything that "would place it out of his power to bring suit if called on so "to do." (12 Wheat., 636 ; 4 How., Miss., 684.)

In Sailly v. Elmore, 2 Paige, 497, the court say : "The surety "will be discharged by any agreement or dealing with the prin- "cipal debtor and creditor which operates as a fraud on the "surety." There is no allegation or pretense of fraud between Wallace & Co. and Williams. The gravamen of the charge of the court of which we are complaining is, that the conduct of Wallace & Co. in demanding a payment of Williams was a change, or breach, or repudiation of the contract, and certainly, if Williams made a payment on the note, although not bound to do it, the acceptance of such payment, although influenced under the "stress" of the process of the court, is no fraud on Mrs. Williams. All her rights and all her remedies remain

unchanged, and she has less money to pay by two thousand five hundred dollars than she was originally bound to pay.

See the case of Ide *v.* Churchill, 14 Ohio R., 346, for a discussion of some of the principles to which we have referred. The court say: " Among the rights secured to the surety is " that of paying the debt when it falls due, and being sub- " rogated to all the rights and remedies of the creditor, and of " calling for immediate contribution from his co-sureties. The " creditor occupies the position of a trustee for the surety in " respect to all the collateral securities for the debt." * * * The court proceeds to quote from Story's Eq., Section 325, and says: " But while the discharge of the surety in all such cases " is thus positively stated, * * * it does not follow that " the surety is necessarily discharged from the whole debt. " * * * So far from equity inflicting penalties in such cases, " it may be stated as a general rule, that where the original " agreement remains intact " (as we maintain it unquestionably does in this case), " and only the equitable rights or remedies " of the surety have been invaded, his manner of relief in a " court of equity will be exactly commensurate with his actual " loss. * * * Where no change has been made, and the " surety remains bound to his original stipulations, and has " been injured by the act of the creditor only in respect to the " means of satisfying the debt, or of reimbursing himself, he is " entitled to have deducted from the debt an amount equal to " his injury, and no more. No penalty is to be inflicted," etc.

Now, apply these principles to the case under discussion. Mrs. Williams, the surety, had a perfect right to pay the debt when it fell due. This right was not impeded by the conduct of the appellants in asking a payment on the note before it fell due. Nor did their conduct deny to her the right of being subrogated to all their rights and remedies at the maturity of the paper.

There were no collateral securities for the debt in the hands of the appellants, of which they could be trustee for her, and

of which she was deprived by their acts. There is no allega-
tion of this kind anywhere in the pleadings, and no issue of
that kind was discussed or alluded to in the court below, or in
any manner presented to the consideration of the jury. Our
attention is called for the first time to this question in a note
in appellees' brief, citing Watt v. White, Smith and Baldwin,
33 Texas, 425. This authority has no application to this case.
It is entirely irrelevant to the issues joined. See the pleadings.
But even if there were any allegation that effects were attached
in Louisiana by appellants sufficient to satisfy the debt, which
were released, the principle invoked by the authority would
not apply, because the proof would wholly fail to sustain the
allegation. The record of suit No. 1633, commenced in New
Orleans, October 21, 1870, shows nothing but a petition alleg-
ing the indebtedness of Williams to the appellants, and pray-
ing for attachment and summons of garnishment, without
setting forth the value of anything sought to be attached, or
the amount or quantity of any of the effects in the hands of
the insurance agents sought to be recovered. The proof on
this subject is silent in the record, and we submit, before the
case in 33 Texas could for any purpose be invoked, appellee
should prove the value of the effects released. The case of
Ide v. Churchill (supra) settles this question. The court say
(14 Ohio R., 386) that "the release of the surety in such cases
"extends only to the value of the securities released;" and it
is incumbent, on general principles, on the surety to establish
their value by proof. The testimony in the case, however,
shows that appellants realized from said suit all that could be
realized. In Evertson v. Booth, 19 Johns., 486, the court say:
"Where there exists any doubt of the sufficiency of the first
"fund, or where the prior creditor is unwilling to run the
"hazard of getting payment out of that fund, there is no prin-
"ciple which will take from him any part of his security until
"he is completely satisfied." In the case at bar the appellants
were secured in Texas by a mortgage, which was a lien created
by express contract, whilst White, Smith and Baldwin only

held an equitable vendor's lien, which is "the mere creature of "equity." See paragraph four, page 307, 1 Hill on Mortgages, for the principle that "nothing will operate as a discharge of "a mortgage but actual payment or an express release." The same principle in Crosby v. Chase, 5 Shep., 369. The mortgagee holds an estate in the property vested in him for the security of his debt. The title to the property for that purpose vests in the mortgagee, and whatever extinguishes the debt will extinguish the mortgage, and nothing else. (1 Hilliard, 306.) "Where mortgages are accepted, the creditor does not "waive other remedies guaranteed to him by law for the col- "lection of his debt." (1 Hilliard, 145, Section 20.) This proceeds on the principle that the mortgagee is invested with the title to the property, to be divested only on performance of the conditions. "It is an unvarying rule in equity, never to "divest one of a legal estate so long as he can show an equi- "table lien on it." (1 Hilliard, 318, Section 28.) The estate of a mortgagee is therefore higher than that held by a merely equitable lien, for in the case of the mortgagee, both the legal and equitable title rest in him. White, Smith and Baldwin held an equitable interest only, while appellants held both the legal and equitable estate, vested in them by the act of Mrs. Williams herself, which estate cannot be divested out of them, except upon performance of the conditions expressed in the mortgage, to wit, the payment of the note. (Henshaw v. Wells, 9 Humph., 568.)

But Mrs. Williams cannot in any view call to her aid the principle decided in the case of White, Smith and Baldwin (supra), for she stands in no attitude to take advantage of it. In that case (33 Texas, 425), the appellees abandoned their security in Texas by resorting to an attachment in Louisiana, and it appeared from the record that they obtained a security ample for the payment of their entire debt and costs.

But we insist that it was by the act of Mrs. Williams herself, in conjunction with her husband and the appellants, by reason of her contract in the execution of the note and mortgage, that

all the securities, of whatever value they might have been, which appellants held under their attachment suit, were released. The attachment suit was commenced on the open account before the note and mortgage were executed. The note and mortgage themselves settled the account, operated in law as an immediate dismissal of the suit in New Orleans, and a discharge and release of any and all funds held by virtue of said suit; and Mrs. Williams being a party to the transaction, is estopped now from asserting that appellants abandoned their mortgage lien by enforcing their attachment in Louisiana. The very reverse is true. The appellants abandoned their attachment in Louisiana, because of the very mortgage which she herself created. The effects held under the attachment cannot inure in any sense to her benefit, because it was by her act that said effects were released. The case in Louisiana was actually dismissed from the docket because Mrs. Williams had given the mortgage and secured the debt on the Texas lands. A rule was entered in the case (see Semmes' testimony) to dismiss for " no other reason " than that the note and mortgage had been taken, and it was dismissed and the payment placed as a credit on the note. This payment inured to her benefit, and the release of all the effects held by the attachment was brought about by her own act, and it would be strange if she were allowed to set up her acts to defeat the very purposes of the mortgage.

Nor does the appellee Hudson stand in any better condition to invoke the case of Watt v. White, Smith and Baldwin. He does not do so in his pleadings; makes no issue upon the point whatever, and tenders no proof to show the value of the effects attached by appellants, if any were so attached. There were no answers to the garnishments, and we are left to the statements of the witness Gill, and the admissions of Williams himself, as shown in that testimony, that the amount paid by Williams in the settlement of the suit No. 1633, was all that could be realized out of that suit, had the same been prosecuted. The appellants were mortgage creditors prior, in point

of time, to the mortgage of Hudson. The mortgage to appellants on the Hopkins county land was recorded November 1, 1870, and the mortgage to Hudson was not recorded till the 22d of November, some days after the actual settlement was made in New Orleans between Williams and appellants. Gill, in his evidence, states (p. 89) that the fund attached was altogether insufficient to pay the debt beyond the amount received from Williams in the settlement. The law is, when there is a doubt of the sufficiency of the first fund, or where the prior creditor is unwilling to run the hazard of getting payment out of that fund, no principle will take from him any part of his security until he is completely satisfied. (Evertson v. Booth, 19 Johns., 486, *supra*.)

Appellants, at the date of the settlement with Williams in New Orleans, had no notice whatever, actual or constructive, of the existence of Hudson's mortgage, and, of course, were not required to square their actions by any supposed rights of his. "In all cases where resort must be had to one of two "funds, the subsequent encumbrancer must have his mortgage, "existent at the time of the existence of the two liens, and in a "condition to assert his claim before one of the two liens is "gone." (Cheesborough v. Mallard, 1 Johns. Ch., 414, 415.) And the prior mortgagee must have notice of the existence of the second mortgage before he would be compelled to elect between the funds. "A subsequent registration is not con- "structive notice to a prior mortgagee. Vendees and prior "encumbrancers are not required to look to subsequent regis- "trations. The presumption in such cases is that no subse- "quent conveyances will be made, and therefore, in such cases, "actual notice must be brought home to the prior mortgagee." (King v. McVickar, 3 San. Ch., N. Y., 192 ; 1 Hilliard, p. 218, Section 71.)

*R. A. Reeves*, and *Walton & Green*, for the appellees. It appears that this contest originally was, as to which of two creditors of W. P. Williams had precedence in their right to

foreclose their respective mortgages upon one thousand five hundred and thirty-six acres of land in Hopkins county, which mortgages were executed by W. P. Williams and his wife Elvira, to secure debts of Williams.

The appellee, Hudson, took the initiative, and sued Williams and his wife in the county of their domicile, for foreclosure of their mortgage to him, and made Wallace & Co. parties. Wallace & Co. answered, setting up their right against Williams as to the debt, and against Williams and wife to foreclose the mortgage.

Williams and wife answered, setting up that the debt due to Wallace & Co. was a debt contracted by Williams as a merchant, in the course of dealing as such, and one for which the said Elvira Williams was in no way bound; that it was a pre-existing debt at the time the mortgage was given, and that the property (the one thousand five hundred and thirty-six acres of land) was the separate property of the defendant Elvira. That the said Elvira was only the surety of her husband in the giving of said mortgages; that the only consideration for the execution thereof, was that the said Wallace & Co., through their agent Maxwell, had promised and agreed to extend the time of payment of Williams' debt to the 1st of January, 1871. That there was no forbearance on the part of Wallace & Co. to the said W. P. Williams; but that he was harassed and closely pressed by a suit at New Orleans, and by attachments on his effects there; that the suit there was not dismissed until Williams was forced not only to give up the effects levied on, but to pay the costs of the proceeding, and, in addition, the fee of Wallace & Co.'s lawyer, for prosecuting the attachment suit.

It is also alleged that, though Maxwell pretended to be the agent of Wallace and Co. in making the settlement with Williams, and taking the note and mortgage, yet Wallace & Co. did not accept his acts as binding on them, and did not act in accordance with said settlement; and that, if ever accepted, the acts of Maxwell were not accepted by Wallace &

Co., until they (Wallace & Co.) had forced Williams, by the harassing litigation in New Orleans, to yield up to them the effects attached by them in that suit, and to do other onerous acts.

The facts show all these allegations to be true.   In fact, it is a matter of great doubt if at any time the acts of Maxwell received the approval of his principals.   It is very clear that the giving of the mortgage was not the principal inducement to the dismissal of the suit ; for, in their answer, after giving an account of the transaction with Williams in New Orleans, and the receipt from him there of two thousand two hundred and seventy-four dollars, they say, " that any further prosecu- " tion of their suit in New Orleans would be fruitless, and " being unwilling to hazard any further expense in prosecuting " said suit, the same was dismissed."

This reason given for the dismissal of the suit is manifestly true, not only because Wallace & Co. say so in their answer, but because the facts show that Wallace & Co. had got every- thing out of Williams that could be had.   None of the other property attached could be subjected to Wallace & Co.'s debt, as other creditors had prior liens upon such other effects of Williams.

And, though it appears the suit was to have been dismissed by Wallace & Co. early in December, yet we find from the record, it was not actually dismissed till 21st December, 1870, only ten days before the expiration of the time given (upon taking the note) as a forbearance on the debt.

It is extremely questionable whether Maxwell had any such authority as he assumed to have in making the contract for the extension of the time of payment of Williams' debt.   He says, that he got a letter from Wallace & Co., giving him full power to make the settlement ; but he also says that he got a telegram next day, telling him to do nothing till he heard from them by letter ; that the letter said he could take security, but *must not extend the time*.   He says, the letter forbade him from ex- tending the time, and that " I extended the time to the 1st of

" January, 1871, *on my own responsibility.*" He told Williams about the telegram, the day after the note and mortgage were given, and said to him, " I consider the settlement binding." He did not make his report to Wallace & Co. till long after the mortgage was taken, nor did he make his report or deliver the note or mortgage till after the dismissal of the suit in New Orleans. Nor did Wallace & Co. know of the transaction till then, so far as we are able to gather from the testimony. It is also clear, from the evidence of Semmes, the attorney of Williams in the New Orleans suit, that Mr. Gill, the attorney of Wallace & Co., repudiated the agency of Maxwell in taking the note and giving time to Williams.

It further appears that even if Maxwell had authority (which is not shown) to make the contract, there was never any acceptance of the same by his principals, Wallace & Co. It is clear Wallace & Co. never intended that such a contract should have been made ; on the contrary, they instituted their suit in New Orleans, and attached the effects of Williams there, only seven days before the note and mortgage were taken at Jefferson. They further directed their agent not to extend the time. Their agent did not report to them what had been done, till long afterwards, nor until Williams was forced by them into another compromise ; nor did they then accept it, until they had submitted the mortgage to their lawyer, Mr. Gill, who gave them to understand it was the best they could do, and that everything that could be forced out of Williams' effects, after careful inquiry, had been obtained by the suit. Nor was it accepted till Williams paid the costs of the suit, and, in addition, paid the exaction of one-half their lawyer's fee.

Several propositions of law arise under these facts :

I. Whether there was any consideration for the contract.

II. Whether there was an acceptance of the contract.

The question of consideration may be considered in two points of view :

*First.* If Maxwell had no authority to make the contract,

it was wanting in mutuality. A contract to be valid must be binding on both parties, and one in which each party has a right to hold the other to a positive agreement. (Parsons on Contracts, Vol. I., 449, and note A.)

The only authority Maxwell had, was to make settlement of the debt. A power to make settlement does not necessarily imply a power to give time, but only to adjust the balances, and to give or take an obligation in accordance with the previous contract of the parties. It is a special agency. It is said in Parsons on Contracts, Vol. I., page 40, "Any specific "authority must be strictly pursued, as, for example, one "known to be an agent to settle claims, and with specific "authority to this effect, cannot be supposed to have authority "to commute them." So, where there is a specific authority to settle, it cannot be reasonably inferred that he had authority to grant time upon a debt already due. Again, it is said, p. 41, "No agent has authority to be in all respects an 'alter "'ego' of his principal, * * and, therefore, the agency must "be special so far as it is limited by place or time, or the extent "or character of the work to be done." (McAlpin v. Cassidy, 17 Texas, 463; McAlpin v. Ziller, Ib., 514.)

But without resorting to construction, we have the positive declaration of Maxwell that he gave the time till the 1st of January, 1871, "upon his own responsibility." His act, in failing to report the transaction to his principal for more than a month afterwards, shows that he was conscious of his want of authority; and the acts of his principals, in instituting the attachment suit in New Orleans and continuing to pursue it, as well as their telegram and letter to Maxwell, show that they did not intend to confer the authority.

Had they intended to confer such authority, undoubtedly their attorney, Mr. Gill, in the New Orleans suit, would not have denied, as he did, the authority of Maxwell to take the note and mortgage, but would have dismissed the suit at once.

We conclude, therefore, that it is clear that Maxwell had no

authority to make the contract, and the principals could not violate the inducement of the contract, and afterwards accept it as binding.

*Second.* But there was no consideration.

It appears from the pleadings of the plaintiff, Hudson, in the court below, and from those of Williams and wife, that Mrs. Williams was induced to give the mortgage on her separate property, in consideration of time being given to her husband to pay the debt of Wallace & Co.

It, must be remembered that this was a pre-existing debt, which had long since been due; that it was a debt for which the wife's property was not bound; and that the mortgage by the wife to secure this debt is in the nature of a guaranty.

Now, in order to support a guaranty or collateral promise, a new consideration is necessary. The consideration necessary to support a contract must be either something beneficial to the promisor, or it must be something given by the promisee, or he must suffer some inconvenience. (Parsons on Contracts, Vol. I., p. 431.)

Forbearance by a creditor to his debtor will support the collateral promise of a third person. (Parsons on Contracts, Vol. I., 440.)

The declaration must state the consideration of the contract, and it must be proven. (Parsons on Con., Vol. I, 442.)

A guaranty not made at the inception of the contract must have a new consideration to support it, and this must be alleged and proved. (Parsons on Con., Vol. II., 7, note p.)

Where a debt has been already created, the consideration is said to be executed or exhausted; and to bind a third person to pay the same, a new consideration is necessary, which must be alleged and proved. (Parsons, Vol. I., 468, 469, 472, 474, and notes e and f; Burge on Suretyship, 13, 14.)

Applying these elementary principles to this contract, we find that this mortgage is entirely wanting in consideration; for, as forbearance of the creditor to the debtor was the consideration or inducement for its execution, and in this case is the

only consideration which can be pretended, in order to enforce that contract, there must have been the forbearance which was contracted for, and it must have been exercised with the spirit of the contract.·

It is said in Parsons on Contracts, p. 442, Vol. I., concerning the consideration of forbearance : " But, in declaring on " a promise made on such a consideration, the plaintiff must " allege and prove the actual time of forbearance, and if this be " judged by the court to be reasonable, the action will be sus- " tained ; but when the stay of action is wholly uncertain, or " such as can be of no benefit to the debtor or detriment to " the creditor, it is not enough."

That the forbearance was of no benefit to the debtor or detriment to the creditor, let the facts speak for themselves.

*Third.* But a contract, to be binding, must be accepted by the party to be benefited thereby. (Parsons on Contracts, Vol. II. pp. 12, 13, and notes.) And this acceptance must be given in a reasonable time. (Parsons on Contracts, Vol. I., 450 and 478, and notes.) On page 40 the author remarks, the party making the promise is bound to nothing until the promisee, within a reasonable time, engages to do, or else does or begins to do, the thing which is the condition of the first promise.

It must be accepted in accordance with the intent and meaning of the parties ; and in case of a guaranty or suretyship, the guarantor or surety has a right to stand on the terms of the contract ; any deviation from the contract will release the obligor. (Parsons on Contracts, Vol. II., p. 17, note m.)

We think, however, from the circumstances proved, that this case stands upon the principle of those where there is only an offer to guarantee. Here Wallace & Co. had brought suit in New Orleans at the time the mortgage and note were executed, and to secure themselves had levied attachments, and taken out writs of garnishment, and Williams' property and assets were seized. This mortgage was then consented to by the wife as an offer to have proceedings stayed and the property released. It was an offer that, if her husband was not harassed with

suits by this party, she would consent to mortgage her land as security for the debt.

An offer of a guaranty must be accepted in a reasonable time (Parsons, Vol. I., 450, 478, and notes); and the guarantor must have notice that it is accepted. (Parsons, Vol. I., p. 478, and note H.)

It is evident that the offer was not accepted by Wallace & Co., upon the terms contracted for, and not being so accepted the guarantor is released.

To allow this mortgage to stand as a security to Wallace & Co, would be to violate the maxim that no one shall take advantage of his own wrong. Wallace & Co. seek in this case to foreclose the mortgage for their own benefit, when, for their own benefit, they violated the contract by which it was procured. As the only consideration which could support the contract of Mrs. Williams was, that the creditor should forbear to her husband, when he failed to comply, there was no consideration for the contract whatever, and the mortgage cannot be enforced.

WALKER, J. On the 28th day of October, 1870, W. P. Williams, the husband of Elvira A. Williams, being indebted to the appellants, Wallace & Co., on an open account amounting to near eight thousand dollars, gave his note and mortgage for the amount of the account, due the first of January, 1871.

Mrs. Williams joined her husband in the mortgage, and it was given over one thousand five hundred and thirty-six acres of land in Hopkins county, which Mrs. W. owned in her own right. This arrangement was entered into on the part of Wallace & Co. by their agent, Robert Maxwell. The Williamses afterwards gave a mortgage to Thomas J. Hudson, and this suit was commenced by him to foreclose his mortgage, making the appellants parties.

It appears that a few days before the execution of the note and mortgage to the appellants, they had commenced a suit on their account against Williams, in New Orleans; attaching

certain rights and credits belonging to Williams, and gar-nisheeing persons supposed to be indebted to him.

On receiving information of the arrangement made through their agent, Maxwell, with the Williamses, they refused to dismiss their proceedings in the Louisiana Court, and thus re-pudiated the act of their agent. They pressed their attach-ment suit, until Williams had paid them the sum of two thousand five hundred dollars, on their debt, and also had paid to Colonel Gill, their lawyer, the sum of one hundred and twen-ty-five dollars as a part of his fee for prosecuting the suit. The attachment suit was never dismissed until a few days before the maturity of the note, and then only on condition of the payment of the money, as before stated.

The evidence leaves it very doubtful whether Maxwell had any power to bind Wallace & Co. by an extension of time to Williams or not. At all events, the appellants refused to be bound by the arrangement, and yet they are now claiming to set up their lien on the mortgaged premises as prior to that of Hudson.

Some very nice questions arise in this case. If Mrs. Williams is to be treated merely as a security on the note and mortgage, for her husband, it is doubtful whether she could be heard to complain, as the acts of Wallace & Co., in pressing their attachment suit, did not increase her risk or enlarge her liability, but diminished both, by the payment of the two thousand five hundred dollars collected in New Orleans through the attachment suit; and it appears from the evidence that this attachment suit was pressed to its ultimate result, as far as money could be made by it.

But, looking at all the facts in this case, we think the law makes Mrs. Williams a guarantor of a previously existing debt of her husband, and to support such a guaranty a consid-eration is required. There was a consideration stipulated for, to wit: an extension of time to her husband, within which to pay his debt; but this consideration failed by the act of the appellants. They refused to be bound by the acts of

their agent, Maxwell, and whether the law would have held them bound, or not, we think is quite immaterial in this case. Williams did not choose to test this question. He appears to have been in the power of the appellants, and they used their power; whether wisely or not, remains to be seen. It was a wise and a true saying, " The borrower is slave to the lender." We do not think the law will hold Mrs. Williams bound, or enforce the mortgage over her property, in favor of the appellants in this case.

The charge of the court is ably criticised by appellants' counsel. There may be some inaccuracies in it, but we do not think the appellants have any reason to complain of it. The brief filed by the appellants in this case ably supports an opposite view to that which we have taken. Many authorities are referred to, but upon careful examination it will be found that none of these authorities will apply to a state of facts such as are presented in this case, and yet hold that the guarantor would be bound. The case of Terrill v. Smith, 8 Conn., 429, is an ably considered case. There the court say : " Nothing short of an actual payment, or some act or neglect " of the creditor, will discharge the liability; the terms of the " guaranty are that the note shall be paid." Here there is an act on the part of the creditor—an act which takes away the consideration for the undertaking ; which robs the contract of its very essence ; and in such case we think the learned court which decided Terrill v. Smith would hold, with us, that the liability is discharged.

For the reasons herein given, the judgment of the District Court is affirmed.

Affirmed.